## ESTATE OF BERTHA ELLINGHOUSE, DECEASED.

### [No. 28,278; January 22, 1906.]

**Insane Delusions.—Prejudices, Dislikes and Antipathies,** however ill-founded or strongly entertained, cannot be classed as insane delusions.

**Insane Delusions.—If One's Mind is Tricked or Deceived** into a false opinion, it is played upon, or deluded.

**Insane Delusions.—An Insane Delusion is the Spontaneous Production** of a diseased mind leading to the existence of something that either does not exist or does not exist in the manner believed—a belief not entertainable by a rational mind, yet so firmly fixed that neither argument nor evidence can convince to the contrary.

**Insane Delusions.—In order to Attack Successfully a Will** on the ground of insane delusions had by the testator, it must be shown that such delusions operated to cause the production of the will.

**Undue Influence.—The Burden of Proof, in the Case of a Will Contest** on the ground of undue influence, is on the person contesting.

**Undue Influence.—Undue Influence, Such as Invalidates a Will,** is something more than mere general influence not brought to bear upon

the testamentary act; it must have been used directly to procure the will and have amounted to coercion, destroying the free agency of the testator.

**Undue Influence.—If a Motive or an Opportunity for the Exercise** by anyone of undue influence upon a testator is shown, the law will not presume from this that such was exercised, and the showing does not shift the burden of proof.

**Undue Influence.—Proof That a Person's Influence Over a Decedent** was great would not be proof that it was unlawful or undue, and from the existence of it no presumption would arise of its actual unlawful exercise, even though it had manifestly operated on the decedent's mind in making a testamentary disposition.

Samuel M. Shortridge, for contestants Edward C. Ellinghouse and Emma M. Stone; Louis P. Boardman associated.

Andrew Thorne, for respondent Oscar Ellinghouse.

COFFEY, J. Bertha Ellinghouse died on February 14, 1903, in San Francisco, of which city she was a resident, leaving estate therein, according to the petition for probate filed March 7, 1903. She was a widow, with three surviving children, who are mentioned in the will in contest. That document is here inserted:

"In the name of God, amen: I, Bertha Ellinghouse, of the City and County of San Francisco, State of California, of the age of sixty-six years, and being of sound and disposing mind and memory, and not acting under duress, menace, fraud or undue influence of any person whatever, do make, publish and declare this my last Will and Testament, in manner following, that is to say:

"First—I direct that my body be decently buried with proper regard to my station and condition in life and the circumstances of my estate.

"Secondly—I direct that my executor hereinafter named, as soon as he has sufficient funds in his hands, pay my funeral expenses and the expenses of my last illness.

"Thirdly—I give and bequeath to my daughter, Emma M. Stone, wife of W. R. Stone, of Sacramento, California, the sum of Fifty ($50.00) Dollars, also my diamond pin (containing one diamond), and my watch and chain.

"Fourthly—I give and bequeath to my son, Edward C. Ellinghouse, of the City and County of San Francisco, State of California, the sum of Fifty ($50.00) Dollars.

"Fifthly—I give, bequeath and devise all the rest, residue and remainder of my estate, of every kind and nature, real, personal and mixed, and wheresoever situated and owned by me at the time of my death, to my son Oscar Ellinghouse, of the City and County of San Francisco, State of California.

"Sixthly—I hereby nominate and appoint my said son, Oscar Ellinghouse, the sole executor of this, my last Will and Testament, to serve without any bond or other security being required of him.

"Seventhly—I hereby authorize my said executor to sell all or any portion of my estate, either at public or private sale, and without any order of Court previously had therefor.

"Eighthly—I do hereby declare that the disposition of my estate, as set forth in the foregoing paragraphs, is made after mature thought and consideration, in accordance with my express wishes and desires in the matter, and according to what I think right and just. I do hereby further declare that I make the above disposition of my estate as my own free and voluntary act, while in posession of my full senses, and without any suggestion, intimation, influence, intimidation, duress, menace or fraud on the part of any person whatsoever.

"Ninthly—Should any beneficiary or beneficiaries under this Will contest the probate thereof or contest any of the provisions thereof, or should any beneficiary or beneficiaries under this Will institute legal proceedings looking to the defeat of any of the provisions thereof. then in such event. the beneficiary or beneficiaries so contesting or so instituting legal proceedings shall forfeit all right to any and all bequests, legacies, gifts or devises herein provided, and shall forfeit all right to inherit any property whatever belonging to me. And in the event of such forfeiture I direct that the bequest, legacy, gift or devise so forfeited shall be included in the residnary clause of this my last Will to be disposed of according to law.

"Lastly—I hereby revoke all former wills by me made.

"In Witness Whereof, I have hereunto set my hand and seal, this Fifteenth day of September, One thousand nine hundred and two.

"BERTHA ELLINGHOUSE. (Seal)

"The foregoing instrument, consisting of two pages besides this, was at the date hereof, by the said Bertha Ellinghouse, signed, sealed and published as, and declared to be her last Will and Testament in our presence, and we, at her request and in her presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"J. A. RUSSELL,

"Residing at 2820½ Bush St:, San Francisco, Calif.

"H. C. KLOPENSTINE,

"Residing at 1001 Pine St., San Francisco, Calif.

"GEO. H. CHAPMAN,

"Residing at 1001 Sutter St., San Francisco, Calif.

"ANDREW THORNE,

"Residing at 2131 Larkin St., San Francisco, California."

March 19, 1903, Edward E. Ellinghouse and Emma M. Stone preferred a contest to this document on the grounds, shortly stated, of nonexecution according to law; unsoundness of mind; and, undue influence exercised by proponent.

To this contest proponent made answer July 6, 1903, denying specifically all the allegations. The case came to trial on October 19, 1905, without a jury, and continued intermittently until November 22, 1905, when it was submitted.

The burden of proof is upon contestants. The actual execution of the will is clearly established. The controverted issues were unsoundness of mind and undue influence and fraud.

As to unsoundness of mind the evidence that at the time of the testamentary transaction the testatrix was incompetent is insufficient to justify a finding to that effect. The counsel for contestant declares that the nature of the instrument proclaims its falsity, and he dwells with indignation upon the wicked character of the instrument which he says could not have sprung out of the heart guided by a sound mind. The document itself does not demonstrate this theory. The

definition of soundness of mind currently accepted by the courts is to be in full possession of one's mental faculties, free from delusion and capable of rationally thinking, acting and determining for oneself.

A person may be said to be of sound and disposing mind who is capable of fairly and rationally considering (a) the character and extent of his property, (b) the persons to whom he is bound by ties of blood, affinity or friendship, or who have claims upon him or may be dependent upon his bounty, and (c) the persons to whom and the manner and proportions he wishes the property to go.

A partial failure of mind and memory, even to a considerable extent, from whatever cause arising, will not disqualify testator, if there remain (a) sufficient mind and memory to enable him to comprehend what he is about, and (b) ability to realize that he is disposing of his estate by will, and to whom disposing.

In deciding as to testamentary capacity, it is the soundness of mind and not the state of bodily health that is to be considered.

A person's bodily health may be in a state of extreme imbecility, and yet he may possess testamentary capacity; i. e., sufficient understanding to direct the disposition of his property.

Neither old age, distress, nor debility of body incapacitates to make a will, provided there remain possession of the mental faculties and understanding of the testamentary transaction.

The *prima facie* character of a will as just or unjust, equitable or inequitable, is no test of testamentary capacity.

(a) Weakness of mind is not the opposite of soundness of mind; (b) weakness is the opposite of strength, and (c) unsoundness the opposite of soundness.

(a) A weak mind may be a sound mind, (b) while a strong mind may be unsound. (c) Illustration of men of contrasting grades of intellect.

(a) Neither weakness nor strength of the mind determines its testamentary capacity; (b) it is the healthy condition and

healthy action—the even balance—which we denominate soundness.

So far as the language of the will is concerned, it is couched in the highly artificial style of lawyers, but if the idea expressed be that of the testatrix, the fact that she has chosen to make an invidious discrimination against certain of her children is not in itself enough to suggest mental incompetency or import insanity. The will may be in its terms unjust, unreasonable, and even cruel, but if it be the emanation of a sound mind, and if no apparent restraint or undue influence is proved to have induced its execution it must be sustained. Such is the law as laid down by the supreme court. It would be better if controversies of this character were composed without recourse to the courts, but since they are here we must deal with them practically. The evidence for contestant tends to show that decedent was a very nervous woman, excitable in temperament, fretful, and inclined to melancholy, especially after the death of her son, Alfred, to whom she had been tenderly attached, and whom she thought to be still living, and that she was somewhat subject to delusions in this respect. She worried a great deal about him, was much addicted to fretting, and also very sensitive upon the score of her deformity. It appears that she was very small in stature; through some misfortune in birth, or immediately after, she became a hunchback. She was irritable, quick to anger, used to tremble and weep at times, had crying spells, and was at times unconnected in conversation, was notional and changeable, the least trifle would excite her, was forgetful, very weak bodily, susceptible to suggestions and easily influenced. As to one of her alleged delusions, she conceived the notion that someone had obtained entrance to her room and had stolen a clock, stolen something which did not exist, and she complained to the hotel clerk, Mr. Phelps, who tried in vain to reason her out of this belief, but she could not be convinced to the contrary. Testimony to this effect amplified was given by a number of witnesses who knew the decedent at the Hotel Repelier where she boarded for some time, and these witnesses based upon such observations an opinion that testatrix was of unsound mind.

All of this testimony goes to a period sometime anterior to the execution of the will and while the witnesses concluded that she was of unsound mind at times, their reasons appear somewhat inconsistent with that conclusion, and do not point to the time of the execution of the will. As to the clock incident alluded to, Mr. Phelps, the clerk of the Repelier, who had known her as a guest for about a year, considered her very peculiar or unsound, but not until this incident; prior to that *he had not* noticed anything out of the way with her; if, as a matter of fact, however, there had been a clock, he would consider her of sound mind. It appears from the evidence for proponent that there was some reason for her complaint, and this evidence, therefore, is tantamount to an opinion that she was of sound mind. In examining the testimony, it is hard to find from these witnesses a tangible basis for their opinions. Nearly all testify that her mind was at times sound, at other times unsound. Mr. Foster, who conducts the Repelier in conjunction with his wife, says she was physically an invalid, very nervous at times, she was peculiar, a lady he could not understand; when she responded to his greeting, he thought she was all right; when she did not speak to him, he considered her mind affected; he never had any extended conversation with her. Mrs. Foster did not think she was of sound mind, but she fails to give any substantial reason for her opinion except that she was very sick and very nervous. She thought decedent was of sound mind, however, when she spoke of her son's wife and of leaving her property to her children equally, and of Oscar's objection to this disposition. Mrs. Edwards, who had known her a long time, testified that in the first place she was a very bright, intelligent woman— a hardworking and capable woman. Afterward she could see the natural decay coming on. From the time of Alfred's death, from the time she broke up her house on McAllister street, she was entirely changed, because she said she had no longer a home of her own, and the children were all married and gone. She felt that she had not any home and that there was not anything any longer and from that time she became deteriorated and became weaker and sicker; all the way from

the time that Alfred went to Paso Robles Springs she was very weak and sick indeed.

Mrs. Edwards further related one or two incidents to illustrate the change in decedent and said she would describe her actions as actually childish, weak and childish and trembling; just a little bit of a child and when the witness had seen her in the bright mind she had all through life, how quick and active and bright she was, and then noticed the decay come, the gradual decay, it was very perceptible; she could not see; her eyes were very bad; she had no resisting powers whatever, either physical or mental. In connection with this statement of the witness may be considered her answers in direct examination given shortly subsequent to the foregoing. Interrogated as to what she observed as to whether decedent was changeable in her likes and dislikes, whether she had one idea to-day and another to-morrow, she answered, "No, sir. I think she was very firm." Decedent was very unhappy after she broke up her home on McAllister street. She had mentioned to witness that she desired to dispose of her property share and share alike for her four children, and on one occasion when witness took her down to the Beach, they sat down on the sands and talked quite awhile; decedent said there was no use making a will because the four children were her natural heirs and they would have share and share alike. Mrs. Edwards told her she ought to make a will and she replied: "Maybe some day I will do it. The only change I would like to make, I would like to have Ollie, that is Mrs. Stone's daughter, have some little thing, because she is the only granddaughter I have got. "Well," she said, "it seems unjust, for Oscar has had more than any child I have had. All the others had to work very young, but he never had to work young, and remained in school and received his education and graduated, a privilege that none of the others ever had." That was the only difference she made. Now, she spoke of it again at the Repelier when Alfred was away. The same thing was spoken of again. She spoke of Oscar the same way.

The last time this witness saw decedent was on the day of Alfred's funeral and the conversations just referred to were

when he was at Paso Robles about a month prior to his death; decedent seemed to know what she was talking about on those occasions and her mind was perfectly clear. Witness said, in answer to a cross-question, whether she came to court to try to make out that decedent was insane and childish: "Absolutely no. I never said once that she was insane, idiotic or anything of that kind"; she thought, however, that her mind was undermined by her long sickness and trouble; but at the times of the conversations alluded to it was perfectly clear.

She was fond of the theater and was interested in current events. She was always a bright woman and kept in touch with books, all the nice books, and would read anything, a fine mind, very well read; once witness said she would bring her down a book, but decedent answered that it was no use, as she could not read any more; she could not see and could not remember a chapter; she was doing some fancy work, she said it was Alfred's scarf, but she could not finish it; her eyes were very bad. There were times when she worked very hard.

Mrs. Edwards never called at 1306 Polk street and had no knowledge of decedent's condition of mind at the time of the signing of the disputed document.

For aught this witness actually knew of the mind of decedent it was as "perfectly clear" at that time as when she conversed with her concerning the children and said they would share equally in her property.

Mrs. Willetts knew decedent many years and saw her frequently; decedent used to take her to the theater; witness was at her home only twice, but decedent called upon her a number of times and took her to the theater; she was nervous, at the theater she would act very queerly at times, she would not talk to witness probably very much, and she would ask decedent if she had done anything to offend her; the answer was, "Why, no, you have not done anything"; witness said, "Why do you act that way"? and decedent replied, "I just don't feel like talking"; and she would not walk with witness alongside on the street because she was so small and witness was so tall; she said it made her look smaller by walking with witness; she was very peculiar about that; she was sometimes

taciturn, again pleasant, very changeable; she read a great deal, said she read for pastime, but did not remember very much what she read next day after reading the books.; witness said to her then that she supposed she found only pastime in going to the theater, and witness remembered what good times they had together; she answered that she didn't remember one play from another; she got them all mixed up and she was not as strong as when witness first knew her; she worried a good deal about Edward because his health was poor, he had worked a good deal on the typesetting machine and his wrist was weak and she did not believe he would be able to support a family; she was very weak, could not hold connected conversation, easily influenced; used to fly from one subject to another; but witness could not give an instance from her experience with decedent on any of these heads; on the contrary it appears from her testimony that she had long conversations, one particularly about a clock, which has been adverted to, although its relevancy to the issues herein is not apparent.

Miss Daisy McKee, a daughter of Mrs. Edwards, knew decedent about fifteen years, she and her mother went to the theater with decedent quite a number of times a week during the time she lived at the Repelier, always in the evening; witness saw her at least once after she moved to 1306 Polk street; she was notional and changeable; not, in all matters, in her right senses; but she could not recall an instance to illustrate her opinion on this point during all the period of their acquaintance, except when she prepared some egg and sherry for her and sometimes she would take it and sometimes refuse and she did not care for it, and another time she was sick and wanted water and when witness procured it she did not take it, and another time she left the theater before the play was over. Many persons leave the theater before the end of the programme without being suspected of unsoundness of mind.

Mrs. Dowell testified that the decedent roomed in her house on Ellis street for about nine months, leaving there shortly before the holidays of 1901, when she went to the Repelier; during that period she saw her every day; she was a very

nervous woman; melancholy; crying and worrying most all the time, she sat up quite late at night watching for her son to come in very often; used to cook in her own room; much confined in her own apartment; worried considerably over her son Alfred's business; her whole heart was set up in that boy; she loved him. Alfred was engaged in theatrical enterprises. She was very affectionate toward her daughter, Mrs. Stone, who came from Sacramento to visit her; they went together to the theaters very often; she seemed to worry a good deal, but was at times very cheerful; she was quite an active little lady; very quick to anger; she said she had given Mr. Stone $4,000 to $5,000 in his business and that he had gone through it all; Oscar used to call to see her about once a week, with his wife; there was no sunlight in her room; she used to do fancy work, which required good eyesight, very fine work; she was very honorable. This is about the purport of the testimony of Mrs. Dowell, and there is nothing in it to authorize a conclusion of unsoundness of mind, even if it were not too remote in point of time to be considered in connection with the issue involved.

Mrs. Elizabeth Ellinghouse, wife of the contestant, Edward, thought that decedent was of unsound mind on September 15, 1902, "simply for the reason of her signing that document," for decedent always said when she was living with her that her children should share and share alike. At such times she knew what she was talking about and was sound. Decedent left the house of witness because she could not sleep on account of the noises in the street from passing vehicles, milk-wagons, there was a dairy across the street and she could not obtain adequate rest; she was subject to insomnia, very excitable, and some incidents were related; witness saw decedent at the Repelier, called there with her husband; she was very much worse in condition, more nervous and thinner, feebler, and her mind was not as good as it had been; did not seem to care to converse with anybody; she would not take notice of her visitors, after the death of Alfred she was worse; cried a great deal; memory not so good as formerly; witness called on her at 1306 Polk street from time to time with her husband; she was far worse there; her strength gave way, used

to complain of her head hurting her so terribly and pain in her head; she remarked several times she thought she was going crazy; witness related an incident in this connection on the occasion of one of her visits when decedent went with her husband, decedent was just going in to her door and when they reached the door she had it locked and witness rapped on the door and went in and decedent stood there just like a person bereft of reason. She had locked the door leaving her visitors on the outside and witness rapped and when they were admitted witness asked her why she locked the door, and she stood still for a moment and gazed around frightened like and said she thought somebody was coming after her, and witness put her arm around decedent and led her over to the couch; this was in the latter part of October; witness continued her visits to the latter part of November; she continued to grow weaker in every way.

The evidence of Edward C. Ellinghouse, one of the contestants, and husband of the last named witness, and son of decedent, is in the main the same as his wife. He visited his mother frequently at 1306 Polk street; in September, and from October, 1902, practically every night until she died and her manner was affectionate and pleasant; he was at no time excluded from her presence; he was not prevented from seeing her alone daily for hours at a time, although his contest asserts to the contrary; she did not tell him that she had made a will, nor anything about the disposition of her property; he used to read the papers to her; as evidence of the insanity of his mother he stated that the mere fact of her signing such an instrument was enough to convince him that she was of unsound mind; but he talked about business matters and about family affairs; about Alfred's estate, and other details too numerous to mention; he repeats that she was nervous, feeble, had hallucinations; witness had not visited his mother from November, 1899, until July, 1902. This might seem to indicate some estrangement between them. He rather reluctantly admitted that when she talked of dividing her property equally among her children she was sane. In reference to the administration of his brother Alfred's estate, about which the witness seemed to be vexed, he testified that Oscar had always

attended to his mother's business affairs. He says his mother was afraid of Alfred and in support of this statement relates one or two instances which do not seem to the court to be conclusive of that fact.

Mrs. Emma Stone's testimony was much to the same effect as her brother Edward's. She testified that her mother was very nervous and very excitable; that the least little thing would make her nervous; that she was troubled with insomnia, but that medicine taken to produce sleep had the desired effect; that she dozed off in the daytime; that she was troubled with a tooth; that she was sensitive as to her physical deformity; that on July 7 or July 8, 1902, she went to the theater with her mother at night; that she went out several times after this occasion with her mother and went to the park; that her mother had said, after Alfred's death, that she wanted to die; that after Alfred's death her mother thought Alfred was still living, and she had said to her: "Why, Emma, here he comes, listen." Her mother had many times told her that she would never make a will and that she wished her children to share equally in her property. The last time her mother said this was on September 12, 1902, and she further testified that at this time, namely, September 12, 1902, she was perfectly sane. At that date her mother knew what she was talking about and her mind was clear and that was the last occasion thaat Mrs. Stone saw her, and yet she testifies that three days afterward her mother was of unsound mind. Mrs. Stone also testified, in regard to undue influence at the time of making the will, that when her mother was living at the Repelier after Alfred's death, she said one day that Oscar was very queer; that he was a peculiar boy and she really could not say that her soul was her own; she was really afraid to say anything because he got so angry and worked up. At the time she said this Mrs. Stone testified that her mother was perfectly sane; she seemed to be sensible; this was three or four days before she moved to 1306 Polk street; she talked in a perfectly rational manner; she was not irrational at all times; there was no suggestion of mental impairment when she last saw her; she was perfectly clear in her mind as to the division of her property

among her children; she exhibited no signs of insanity then at all; that was on the 12th of September, 1902.

Mrs. Stone testified that her mother could not carry on a consecutive conversation, she would drift from one subject to another, and yet it appears from her testimony that she had frequent long talks with her about her affairs; at the time she talked with her about the equal disposition of her property her mind appeared to be sound; it was always her wish and uppermost in her mind that her four children should share and share alike; as to that matter she seemed to appreciate and understand her own wishes. Mrs. Stone said her mother was forgetful, but she could not specify any instance except that at one time she had forgotten where she had put her purse; and another time she went out into the hall and tottered about and could not find her way back, and another time she forgot what she had been talking about; she could not think of any other specific instance. Mrs. Stone testified that her mother was easily persuaded, and the only instance she gave of that fact was that she could persuade her mother to take her meals. Further she said that her mother was susceptible to suggestions, but she could not give an example of such susceptibility.

As to her mother's physical condition, Mrs. Stone said that on her visits to her mother when not living at a boarding house, her mother did all the cooking for herself, for the witness and for the daughter of the witness, and did the housework when Mrs. Stone and her daughter visited Mrs. Ellinghouse.

The testimony of Mrs. Stone relative to the visits of Oscar Ellinghouse and wife to a medium, could have had no effect upon the mind of the testatrix, for the alleged communication from the mother of Mrs. Oscar Ellinghouse was in reference to Alfred being happy, and the second occurrence referred to happened long after the will was executed, so that neither of these instances shows any undue influence or any unsoundness of mind.

When her mother moved to 1306 Polk street, witness was present and made no objection. The witness had never been

forbidden the house on Polk street, had free access thereto and freedom of intercourse with her mother.

Miss Arlie Stone testified that decedent, after her son's death, was under the impression that he still lived, and said, "Why, Alfred is calling me."

This witness further testified that she took decedent on her knee after Alfred's death and bounced her up like a child; that she had read the novel called "The Christian" to her in July, 1902; that she went out with her a while at the Repelier, from July 7 or 8, 1902, nearly up to the time of Alfred's death. This witness testified further that at 1306 Polk street Mrs. Ellinghouse stood at the window and threw a kiss to her and her mother on September 12, 1902. After Alfred's death, the witness swore that decedent said to her: "When I die I want all my property to be divided equally." Miss Stone said that at that time decedent was of sound mind.

It appears that at the time of Alfred's death his mother realized that fact; although she was greatly agitated, she entertained no delusion about that event.

Contestants undertook to establish that the respondent, after the death of Alfred, persuaded his mother against her will to leave the Repelier and to live with him, but the evidence is rather that she went voluntarily and without objection on the part of her other children from a boarding house to the home of her son Oscar.

There are many circumstances which might be cited in addition to those already given to show that the decedent was laboring under mental stress on account of her bereavement. She was troubled and worried, grieved naturally over her loss. Physically she was not strong and had the infirmities incident to age; but the court cannot find, as contestants assert, that she was suffering from and had reached that point denominated senility fully one year before the 15th day of September, 1902, the date of the disputed document. The witnesses for contestant show from their statements of intercourse and association with her during that period that she was at times very active and bright mentally. Witnesses give their opinion that she was unsound in mind, yet at the same time testify that

she conversed with them intelligently and frequently and was at such times rational. She was emotional, excitable, nervous, subject to depression of spirits, but many persons in similar circumstances are so affected and yet possess testamentary capacity. She had had a tooth extracted and endured much pain, complained that her head was troubled on account of it; but that might well be without resulting in unsoundness of mind. Taken altogether, the testimony for contestants would not warrant a judgment that at the time of the testamentary transaction the testatrix was of unsound mind. It appears after a careful examination of the testimony that these witnesses dealt with her on a basis of her soundness and that their opinion that she was not competent is because of the character of the instrument and its unequal distribution of the property.

Some witnesses testified that her eyesight became bad, and probably as years advanced she could not employ her eyes to the same advantage as formerly, but up to a few weeks prior to her death she read the daily newspaper every day and then her sons read to her; she could see her daughter and granddaughter from the window of her room at a distance; she was an adept at fine needlework and used her hands deftly in that occupation, "she did very beautiful fancy work," she would do a great deal in a short time; this was very trying to the eyes; it required good sight, but toward the end she remarked that her eyes were failing; a little while before she left the Repelier she wore dark glasses and discontinued her fancy work and did not read so much; this statement came from a witness from contestants; but it appears elsewhere in the record that she did not so soon abandon her work or her reading. An examination of the signatures to the will and the other papers would seem to indicate that her eyesight was good; considering her age her name is written in a firm hand and with accurate alignment and the characters are distinctly drawn and unusually legible. In this particular, at least, there is no suggestion of impaired eyesight nor any symptom of mental unsoundness. The testimony for contestants cannot be said to be satisfactory on this issue. On the other, the respondent produces witnesses who testify as to what they observed and what occurred when the document was exe-

cuted. While they were not intimate acquaintances, yet they were qualified by statute and their evidence, unless contradicted or impeached, must be considered as trustworthy, not discrediting others, but weighing it according to the rules of law. The statute provides that there may be adduced in evidence, the opinion of a subscribing witness to a writing the validity of which is in dispute, respecting the mental sanity of the signer; and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given. To make the opinion of an intimate acquaintance valuable, the reason should be sufficient; but as we have seen in this case the facts fail to sustain the conclusion of contestants and do not square with the requirements of the law. The opinion of an intimate acquaintance is a qualified one; but that of a subscribing witness is absolute, unless he be shown otherwise to be unworthy of credence.

It does not appear that these subscribing witnesses are discredited in any manner, except by reason of their limited opportunities of observation affording them no sufficient foundation to judge of the mental condition of the testatrix; but since the statute capacitates them to testify, even if they were utter strangers, as to what their senses perceived at the moment of the execution, they have a right to be credited by the court. That is the point of time, and if the decedent were lucid then, when all who saw her testify to her sanity, it overcomes the testimony concerning her aberrations on other occasions, even if that testimony were consistent and uniform, which it is not.

The subscribing witnesses testify in substance, all four of them concurring, that she was of sound mind at the time she signed the instrument. One witness may serve as well as all, because there is no substantial discrepancy as to what occurred in their presence. Mr. Klopenstine saw her sign her name and in his opinion she was of sound mind, his belief being based upon her conduct and conversation. She was asked several questions by another witness, Mr. Russell, and her replies were rational; there was nothing peculiar about her; she had no difficulty in writing her name; the paper was read to her before she signed by Mr. Thorne, who was also a witness,

in a clear, loud voice; he asked her if that was her will after she signed it; she responded "Yes"; he then asked her if she wished these gentlemen to witness the will, and she said "Yes"; and then they signed; there was more conversation of which he had no clear recollection; he had not seen her prior to that occasion, and his opinion was confined to what he observed of her in the course of half an hour; respondent was not in the room at the time, nor his wife, although his wife brought the testatrix into the room when the document was executed.

Mr. Russell, another of the subscribing witnesses, testified to the soundness of mind of testatrix. In the course of a conversation with her at that time she volunteered the statement that the reason why she signed this will and gave the property to her son Oscar, was because her other children had not done for her when they were in a position to do anything; that Oscar had always been a dutiful son and had assisted her; the witness asked her some questions and from her answers he formed his opinion as to her intentions and her mental condition; the will was read to her by Mr. Thorne; she said she understood it; there were present the four subscribing witnesses, the decedent and no one else; she was asked by Mr. Thorne if there was any pressure or undue influence brought to bear on her and she said "no"; the will was executed upstairs in the front room, corner of Bush and Polk street. Mr. Chapman's evidence was to the said effect. If she were incapable of making a will, it should seem that some one of these witnesses would have noted some indication of incapacity, but all testify clearly and positively to the contrary.

Neither Oscar Ellinghouse nor his wife was in the room when the testatrix gave instructions for the drafting of her will, the deed and assignment. Neither was in the room when the will was signed. Oscar Ellinghouse testified that he never suggested to Bertha Ellinghouse to make a will, or to sign a check, or to assign the stock, or to make the deed or assignment.

Counsel for contestants comments severely on the transactions by which respondent obtained a conveyance of the

money in bank and the transfer of stock in a building and loan association "as a part of the wicked and unnatural plan and scheme to dominate and control this old and feeble mother," whom he likewise induced to deed to him all her interest in certain real estate, all of which was unknown to his brothers and sister. So far as the deed and assignment are concerned, it appears from the testimony of Mr. Goldner, the notary, that these instruments were acknowledged by her before him on the twentieth day of September, 1902, and that she knew what she was about and was of sound mind. These instruments were signed on the 15th, the same date as the will, in the presence of the same witnesses, who testified that she was of sound mind.

The testatrix told the respondent and told his wife of the fact of having made a will and what disposition she had made of her property, and the testatrix told Mrs. Oscar Ellinghouse when going into the room to sign her will, that she was going into that room to make her will, and after the testatrix came out of the room, she told her that she had made her will. The testatrix knew at the time of making her will the nature and extent of the property of which she was about to dispose, the nature of the act which she was about to perform and the names and identities of the persons who were the proper objects of her bounty and her relations toward them. It appears from the evidence that she conversed intelligently and that she had a good knowledge of every-day affairs, of her property and interests. She certainly had a mind and memory at the time of executing the will competent to deal with and to dispose of her effects among the selected beneficiaries of her bounty. It is not proved that she was at that time the victim of hallucinations or insane delusions, and those that have been testified to concerning her belief that Alfred was alive after his death and the clock incident, assuming that they happened as narrated, did not relate to the will. Such delusions or hallucinations should not affect the making of the will. In considering such a charge, it is important, says our supreme court, to bear in mind exactly what an insane delusion is, and what kind of an insane delusion will justify the refusal of probate to so solemn and important an instru-

ment as a will.  Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion. Whenever one's mind is tricked or deceived into a false opinion or belief, it has been played upon; it is deluded.  But an insane delusion is the spontaneous production of a diseased mind leading to the belief in the existence of something which either does not exist or does not exist in the manner believed— a belief which a rational mind would not entertain, yet which is so firmly fixed that neither argument nor evidence can convince to the contrary.  Moreover, such an insane delusion must have operated to cause the production of the will which is under attack.

In relation to the way in which this will came into existence, censorious comment was made by counsel for contestant concerning the conduct of his adversary which authorizes allusion to the explanation of that counsel as to his connection with the case.  Mr. Thorne testified that shortly after Alfred died, Oscar called at his office and stated that his mother desired him to apply for letters of administration, and that it was necessary to have someone to represent the estate as it consisted mainly of a theatrical business.  Thorne told Oscar that he should apply for special letters and that his mother would have to sign a request for his appointment; the lawyer drew up the request and afterward Oscar brought it to him signed and they went to court and he was appointed special and, subsequently, general administrator.

About a week prior to the 15th day of September, 1902, Oscar came to Thorne's office and told him that his mother desired to see him.  Shortly thereafter, and some days prior to the 15th, pursuant to that request, Thorne called upon decedent at 1306 Polk street and was introduced to her by Oscar.  Thorne had an interview with her alone, lasting some time, in which she told him that she desired to make her will, what disposition she wished to make of her property and to whom she desired to leave it; she told him that she wanted to. make a will as strong as it could be made, so that it could not be broken; that such an attempt would undoubtedly be made and that she desired her wishes carried out; that the reason

that she gave only a small portion to her son, Edward, and to her daughter, Mrs. Emma Stone, was that they had not assisted her when she was in need and when they were able to assist her; the reason that she left practically everything to her son, Oscar, was that he and Alfred had always been good and dutiful to her and had always made provision for her. She told the attorney what property she had, and she fully understood what she had and the objects of her bounty. When the will was prepared, strictly in accordance with her instructions, Thorne asked respondent to have three or four witnesses present at the time of the signing of the same, and thereafter the witnesses appeared at 1306 Polk street on September 15, 1902. The will was carefully read over to testatrix in the presence of all of the witnesses, and the only persons present in the room were the testatrix and these witnesses. The formalities required by law were followed in the execution of the will, and then a deed and assignment read over to her which she signed in the same presence. On the 20th of September, 1902, she acknowledged the execution of the deed and the assignment before a notary public, A. C. Goldner, who explained the documents to her, and she acknowledged to him that she understood their contents and that she had executed them. At the time of the execution of the .will the testatrix was asked whether or not any undue influence was brought to bear upon her, to which she replied that there was none and that she signed the document of her own free will. Mr. Thorne said further that when she gave him instructions concerning the instrument, she stated that she had made such disposition of her property as she had disclosed to him as the result of mature deliberation and that it was in accordance with her views as to what she deemed right and just.

If this statement be truthful, all of the transactions were the result of the request of decedent freely and voluntarily made, and respondent did not resort to undue or any influence to accomplish the purpose of depriving his brother and sister of their statutory share of the succession. The burden of proof was upon contestant and it has not been sustained under the decisions of our appellate courts, which lay down the law

that mere general influence, not brought to bear on the testamentary act, is not undue influence; but, in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will.

The law upon this point is plain.

It is urged by contestants that the circumstances lead irresistibly to the inference that respondent controlled the mind of the decedent and dominated her testamentary act. There are circumstances that justify this suspicion and invite inquiry; but the law will not presume undue influence from propinquity; nor does it shift the burden of proof because of what counsel terms ''nature's fiduciary relation.''

The finding of undue influence must be upon facts proved to the satisfaction of the court. The law will not presume, from the mere fact that there was an opportunity or a motive for the exercise of undue influence, that it was exerted; nor does it presume that undue influence was exercised because of the mental or physical condition of the testatrix; nor because any one of the children was preferred to others and practically excluded from any benefit under the will. The undue influence must be present influence acting upon the mind of the testatrix at the time of making her will, and the exertion of the undue influence upon the very act must be proved. It is needless to repeat here the truisms of the law. Even if it were established here that the respondent had great influence over the decedent it would not necessarily be unlawful or undue, and there would be no presumption of its actual unlawful exercise, merely from the fact that it was known to have existed, and that it had manifestly operated on the mind of the testatrix as a reason for her testamentary disposition. Such influences are naturally very unequal and productive of inequalities in testamentary disposition; but as they are also lawful in general, the law cannot put aside and measure them, so as to attribute to them their proper effect, and no will may be condemned because the existence of such an influence is proved nor because the will contains in itself

proof of its effect. This is the doctrine of our supreme court. In this case there is neither presumption nor proof that the respondent exercised undue or any influence upon the mind of the testatrix at the time of making her will; but there is positive proof that the instrument was the voluntary emanation of her own mind. Upon this point the court must accept the evidence of the unimpeached witnesses to the will. The court is not at liberty to pronounce the draftsman of this instrument false to his oath as a witness nor to his sworn obligation as a lawyer.

In this class of cases the desire of the court is, if possible, to adjust amicably the matter out of court, and it has succeeded sometimes in accomplishing its amiable purpose. If the court had any influence over the parties to this litigation, and if a word of judicial admonition might avail, it would say, "the commonwealth is interested, that there be an end of contention." Application denied.

As to Insane Delusions as impairing testamentary capacity, see Estate of Solomon, 1 Cof. Prob. Dec. 85, and note; Estate of Ingram, 1 Cof. Prob. Dec. 222, and note.